UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KIMBERLEY ANN NESKE,
INDIVIDUALLY AND AS HEIR AND AS
SPECIAL ADMINISTRATOR FOR THE
ESTATE OF JAMES NESKE,

                Plaintiff,

    v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, ET AL.,

                Defendants.

Case No. 2:21-cv-01315-RFB-BNW

**ORDER**

Before the Court are the remaining two Defendants' Motions for Summary Judgement (ECF Nos. 35, 36). For the reasons stated below, this Court grants both motions.

## I.    PROCEEDURAL HISTORY

Plaintiff Kimberly Neske commenced this case by filing a Complaint on July 12, 2021. Id. The Complaint named the Las Vegas Metropolitan Police Department ("LVMPD") and Correctional Officers Cline and Rowe[1] as defendants. Id. Defendants Answered the complaint on July 28, 2021. ECF No. 7. Discovery commenced on September 1, 2021, and concluded on January 20, 2023. See ECF Nos. 12, 32. Following the close of discovery, Defendant Cline was dismissed from the action. ECF No. 36. On February 21, 2023, Defendants LVMPD and Rowe filed separate motions for summary judgment. ECF Nos. 35, 36. Plaintiff Responded to each in separate filings

---

[1] Officer "Rowe" may be named Officer Lowe. For consistency with the caption, he is referred to as Defendant Rowe throughout this order.

on March 14, 2023. ECF Nos. 40, 41. Defendants filed separate Responses on March 28, 2023. ECF Nos. 42, 43. On August 7, 2023, the Court held a hearing on both motions and took them under submission. ECF No. 45.

## II.   FACTUAL BACKGROUND

The Court finds that the following facts are undisputed.

On July 10, 2019, James Neske was in the pre-trial custody of LVMPD and incarcerated at the Clark County Detention Center ("CCD") in Las Vegas, Nevada. From July 7 to July 10, James Neske was housed alone in Cell 14 of Unit 9C. Unit 9C has two tiers, and Cell 14 is on the upper tier. The entrance to Unit 9C is on the bottom level. There is a room linking Unit 9C and Unit 9D as well as separate room with an officer's desk. Correctional officers at the desk can hear at least some noise from 9C. On the night of July 10, Michael Collins was also incarcerated at CCD and transferred to Cell 14. At approximately 10:51 p.m., following a strip search, Collins was placed inside Cell 14 with James Neske.

On the night of July 10 to July 11, Defendant Rowe was assigned to 9C alongside Corrections Officer Morris. Per LVMPD standard operating procedure, Rowe was to perform a walkthrough of 9C at the beginning of his shift and every 30 minutes thereafter. These walkthroughs involve a visual welfare check of each incarcerated person. During the night of July 10 to July 11, Rowe completed two relevant walkthroughs. His first (the "first walkthrough") began at approximately 11:05 p.m. During the first walkthrough, Rowe inspected Cell 14 at approximately 11:07 p.m. and left 9C at approximately 11:08 p.m. His second (the "second walkthrough") began at approximately 11:29 p.m.

Cells in 9C have buttons on the inside which trigger an emergency call light on the exterior and a corresponding signal on a monitoring console operated by correctional officers. Corrections Officers regularly tell people to only press the button if there is an emergency. The buttons are sometimes pressed for non-emergency reasons. Corrections officers are supposed to respond to the emergency lights. Corrections officers can turn off the lights. Once pressed, the light cannot be turned off from inside the cell.

- 2 -

1    At some point after Collins was placed into Cell 14, Collins and James Neske had a

2    physical altercation. The emergency light outside Cell 14 was illuminated when Rowe began his

3    second walkthrough at approximately 11:29 p.m. Rowe completed his walkthrough of the lower

4    tier before the upper tier. Rowe walked past most of the cells in 9C before arriving at Cell 14.

5    Rowe stopped multiple times to talk or drop off paperwork at other cells. By approximately 11:31

6    p.m., Rowe arrived at Cell 14, saw Collins with blood on him, and called in a medical emergency.

7    Following Rowe's call, Officer Morris quickly arrived and together with Rowe, removed

8    Collins from Cell 14. LVMPD standard operating procedure requires two offices to be present

9    before opening the cell door in such a situation. James Neske was lying unconscious on the floor

10    and had blood around his head. At approximately 11:33 p.m., CCDC Medical Staff responded and

11    began providing medical attention to James Neske. James Neske was unresponsive, lacked a pulse,

12    and was not breathing. Paramedics arrived at approximately 11:47 p.m. James Neske regained a

13    blood pressure and a pulse at approximately 11:59 p.m. but he was still not breathing unassisted.

14    James Neske was transported to University Medical Center where he was admitted.

15    Just after midnight July 11, 2023, at University Medical Center, James Neske was

16    diagnosed with <u>inter alia</u> a hypoxic brain injury—a lack of oxygen reaching the brain.  James

17    Neske remained unresponsive and required a ventilator and cardiovascular support. On July 15,

18    2019, James Neske was declared brain dead. The Clark County Coroner issued a report on James

19    Neske's death concluding that a definitive anatomical cause of death was not identified but that it

20    is most probable that James Neske died of asphyxia.

21    The Court finds that the following facts are disputed.

22    Whether a more prompt response by Defendant Rowe could have saved James Neske's

23    life; whether the emergency light outside of Cell 14 was illuminated prior to Defendant Rowe's

24    second walkthrough; whether the Cell 14 emergency light was turned off prior to Defendant

25    Rowe's arrival at Cell 14 during his second walkthrough; whether and to what extent people were

26    kicking their doors and shouting during and before Defendant Rowe's second walkthrough;

27    whether Defendant Rowe was situated so as to see or hear any notification of an emergency prior

28    to beginning his second walkthrough.

**III.    LEGAL STANDARD**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing the absence of material fact. Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to show specific facts demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

However, the nonmoving party may not merely rest on the allegations of her pleadings. She must produce specific facts by affidavit or other evidence showing a genuine issue of fact. Anderson, 477 U.S. at 256 (1986). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage.  Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

**IV.    DISCUSSION AND ANALYSIS**

**A. Plaintiff's Section 1983 Claims**

Plaintiff raises two federal claims against Defendant Rowe, both under Section 1983. Specifically, the Complaint asserts claims for the Violation of James Neske's Life and Security of

1   Person (Count I) and Kimberly Neske's Civil Right to Familial Relationships (Count II). A

2   plaintiff must establish two essential elements to prevail under 42 U.S.C. § 1983: (1) the violation

3   of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation

4   was committed by a person acting under color of state law. Crumpton v. Gates, 947 F.2d 1418,

5   1420 (9th Cir. 1991); see also Long v. Cnty. of L.A., 442 F.3d 1178, 1185 (9th Cir. 2006) (citing

6   West v. Atkins, 487 U.S. 42, 48 (1988)); Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991).

7       There is no dispute that Defendant Rowe was acting under color of law. See also Stein v.

8   Ryan, 662 F.3d 1114, 1118 (9th Cir. 2011) ("Obviously, officers of a state's department of

9   corrections who imprison a person in the state's prison do so under color of law."). Therefore, the

10  Court focuses its analysis on Section 1983's first element.

11          a.   Count I: § 1983 and Deliberate Indifference

12      The due process clause of the Fourteenth Amendment allows a person who is incarcerated

13  to sue corrections officials for injuries suffered in pre-trial custody. See Castro v. Cnty. of L.A.,

14  833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc); Gordon v. Cnty. of Orange, 888 F.3d 1118,

15  1124-25 (9th Cir. 2018). Plaintiff claims that by ignoring warning signs, Defendant Rowe

16  exhibited a deliberate indifference to James Neske's medical emergency. The Court takes this as

17  a medical indifference claim.[2]

18      The elements of a pretrial detainee's medical care claim against an individual defendant

19  under the due process clause of the Fourteenth Amendment are:

20

21  _____

22  [2] To the extent that Plaintiff is articulating that Defendant Rowe failed to protect James
    Neske from Collins, that argument similarly fails. Failure-to-Protect and Medical Indifference
23  claims share the same four-prong deliberate indifference test. Gordon, 888 F.3d at 1124-25. The
    fatal issue for Plaintiff in a failure-to-protect context is a near total lack of evidence that "a
24  reasonable officer in the circumstances would have appreciated the high degree of risk involved."
    Castro, 833 F.3d at 1071. Plaintiff points to statements by Defendant Rowe to the effect that
25  Collins was frustrated at the time he was placed in Cell 14. For example, "I don't know if [Collins]
    was trying to be aggressive with his clothes [during the strip search]. Uh, he – he certainly wasn't
26  listening to us." Even if this was sufficient for a jury to determine Defendant Rowe knew Collins
    was hostile, there is a lack of evidence that a reasonable officer would have noticed the risk and
27  done something to abate it. For instance, there is no evidence for a reasonable trier of fact to find
    inter alia that Defendant Rowe was responsible for Collins placement or had the authority to place
28  Collins elsewhere, that Cell 14 was an unreasonable choice to place Collins in on a night where
    9C's population exceeded the number of cells, or that Collins level of aggression was outside the
    norm for people being strip searched and placed in disciplinary housing.

(1)   The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2)   Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3)   The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4)   By not taking such measures, the defendant caused the plaintiff's injuries.

Gordon, 888 F.3d at 1125 (citing Castro, 833 F.3d at 1071). In determining the third element a court must consider whether the conduct at issue was objectively unreasonable; the subjective state of mind of a corrections official is not relevant to the analysis. Id. (citing Castro, 833 F.3d at 1071). Plaintiff "must prove more than negligence but less than subjective intent – something akin to reckless disregard." Id.

On the record before it, the Court concludes that no reasonable jury could find the Gordon test satisfied. The Court reviews each element in turn.

First, Plaintiff must be able to establish an intentional decision. A failure to act is sufficient for this prong. Castro, 833 F.3d at 1070. Plaintiff argues specifically that Defendant Rowe chose to not respond to the light despite the potential presence of a life-threatening emergency. Here, there are sufficient facts in the record to find that, at a minimum, Defendant Rowe saw the emergency light at 9C when starting his second walkthrough and delayed responding until he arrived at 9C during the walkthrough. During that time, Defendant Rowe stopped at multiple cells to deliver paperwork. Measured from entering the cell, the total delay was approximately three minutes. This is a sufficient intentional delay for the purposes of the first element.

Second, Plaintiff must show a substantial risk of suffering harm. Plaintiff argues that James Neske may have survived with timely intervention and Defendant Rowe's delay created a substantial risk that his condition would worsen. Plaintiffs argue that James Neske could have been saved with timely intervention that Defendant Rowe's delay. Defendants argue that James Neske was on an irreversible path to brain death by the time the emergency light above Cell 14 was illuminated. Both offer experts and rely on exhibits. This is a sufficient dispute of fact over the substantial risk element to pass muster.

1    Third, Plaintiff must be able to support a finding of objective deliberate indifference. This

2    is a heavy burden, requiring evidence "making the consequences of the defendant's conduct

3    obvious." Gordon, 888 F.3d at 1118.

4    Plaintiff argues that the emergency light was potentially lit and turned off multiple times.

5    The only significant support for this contention is the deposition of Cody Kasper, who was a friend

6    of James Neske and incarcerated in 9C on the night of July 10, 2023. Kasper testified that he saw

7    Cell 14's emergency light came on and went off three times that night. Defendants argue that

8    Kasper is unbelievable. Defendants say Kasper admits to needing to squat to see a narrow view of

9    Cell 14. Further, Kasper admits to not being able to see Cell 14's emergency light, instead he

10   claims to have seen the flashes. Defendants also point to several inconsistencies with Kasper's

11   testimony and video evidence.

12   Plaintiff also argues that noise was raised to get the attention of correctional officers, while

13   Defendants point to evidence that 9C was silent during Defendant Rowe's second walkthrough.

14   Officer Morris and Defendant Rowe stated that in the past, they had been able to hear door kicking

15   from the officer's desk. Collins states that he kicked the door and shouted, "Police Come." At one

16   point, Collins states that he had pushed the button and repeatedly kicked the door before "finally"

17   a corrections officer came, "takin' their sweet time." Kasper testified that "the whole block was

18   acting crazy, kicking their doors, being loud," despite "the officers [coming] in and [telling]

19   everybody, you know, to shut up." Kasper also said that first saw the flashing of the light above

20   Cell 14 when he went to his window because he had heard "a couple of other inmates" kicking

21   their doors.

22   Even assuming the truth of the disputed statements of Kasper and Collins, and, in doing

23   so, determine that Defendant Rowe—despite a flashing light and multiple doors banging—slow

24   walked through his second walkthrough, Plaintiff fails to carry her burden. The record is

25   insufficient to support a finding that the consequences of Defendant Rowe's alleged conduct was

26   obvious. Gordon, 888 F.3d at 1118. To the contrary, the record is replete with evidence indicating

27   reasonable officers in Defendant Rowe's shoes would not find that door kicking and the use of the

28   emergency light, without more, indicative of a life-or-death situation. More specifically, there is

undisputed evidence that detainees regularly used the emergency button for nonlife-threatening situations. Collins' shout of "police come" did not alone obviously carry the gravitas of the situation. The record further indicates that a reasonable officer could find that Collins was requesting his possessions, which had yet to be transferred to him. Thus, Plaintiff cannot demonstrate even on disputed facts that Rowe intentionally disregarded a known risk to Neske.

As Plaintiff cannot show that Defendant Rowe failed to take reasonable measures to abate a known medical risk, in a manner akin to reckless disregard of James Neske's health, the Court grants Defendant Rowes Motion for Summary Judgement on Count I.

b. Count II: Deliberate Indifference

Under the Fourteenth Amendment, there is a fundamental liberty interest in the companionship and society of one's child—including adult children—for which the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983. Sinclair v. City of Seattle, 61 F.4th 674, 679 (9th Cir. 2023) (collecting case law) (cleaned up); Porter v. Osborn, 546 F.3d 1131, 1136 (9th Cir. 2008) ("Here, the potential constitutional violation involves the Porters' Fourteenth Amendment due process right to associate with their son, Casey."); Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991) (similar).

The recent case of Sinclair, 61 F.4th at 679, is illustrative. There, a nineteen-year-old man was shot in a protest zone that police had withdrawn from. Id. at 676-77. After medical aid failed to arrive promptly and the man died. Id. at 677-78. The Ninth Circuit permitted the man's mother to bring a "derivative" suit of her son's underlying right to be free from state-created danger. Id. at 679. In Sinclair and Porter, the Ninth Circuit applied solely the constitutional analysis of the underlying right rather than one specific to companionship claims. Sinclair, 61 F.4th at 679-83; Porter, 546 F.3d at 1137-41 (applying the deliberate indifference test). The Court finds here that the deliberate indifference test is also the appropriate inquiry for this claim, as the claim derives from the same alleged failure to act by Rowe.

However, for the same reasons that summary judgement was granted for Count I, the Court grants Defendant Rowe's Motion for Summary Judgement for Count II.

///

- 2 -

c.   <u>Qualified Immunity</u>

Defendant Rowe raises a qualified immunity argument. Defendants are entitled to qualified immunity from Section 1983 claims, if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Gausvik v. Perez</u>, 345 F.3d 813, 816 (9th Cir. 2003) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). On a motion for summary judgment, the Court determines "whether a constitutional violation occurred and, if so, whether a reasonable officer would have acted in the same manner." <u>Id.</u> Since Plaintiff's federal claims fail to show a constitutional violation no further qualified immunity analysis is required. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009).

**B.  Plaintiff's <u>Monell</u> Claim Against Defendant LVMPD**

It is well established under Section 1983 precedent that there is no vicarious liability for an entity and that individual liability of a state official only exists upon a showing of individual "personal participation" in the alleged violation. <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002). Moreover, liability for a public entity (<u>Monell</u> liability) may only be established through a particular set of inquiries and standards. <u>Gordon v. Cty. of Orange</u>, 6 F.4th 961, 973 (9th Cir. 2021) (explaining inquiry for establishing municipality liability under <u>Monell</u>).

Under <u>Monell</u>, when a municipal policy of some nature is the driving force behind an unconstitutional action taken by municipal employees, the municipality will be liable. <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658 (1978). A litigant can establish a <u>Monell</u> claim:

(1) By showing a longstanding practice or custom which constitutes the standard procedure of the local governmental entity;
(2) By showing that the decision-making official was, as a matter of state law, a final policy-making authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or
(3) By showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

<u>Menotti v. City of Seattle</u>, 409 F.3d 1113, 1147 (9th Cir. 2005). Alternatively, a municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability if the failure to train amounts to deliberate indifference to the rights of persons with whom

the employee comes into contact. City of Canton Ohio v. Harris, 489 U.S. 378, 388 (1989). Ultimately, Monell claims are "contingent on a violation of constitutional rights." Lockett v. County of Los Angeles, 977 F.3d 737, 741 (9th Cir. 2020).

Plaintiff asserts that her Monell claim is based on the following pattern or series of facts: (1) LVMPD has a policy regarding emergency lights and the custom and practice resulting is to respond to the call lights; (2) while that policy is not facially unconstitutional, there are a pattern of similar violations shown by Defendant Rowe; and (3) the LVMPD policy is the moving force behind those violations. To establish a pattern of violations, Plaintiff only points to Defendant Rowe's response to James Neske and a statement by Defendant Rowe that he sometimes does not immediately react to the light. In the relevant part, Defendant Rowe states, "we don't go— immediately react because it's disciplinary and it just happens all the time. They are constantly [pushing] their button asking what time it is, if they can have some tissue, what's their court date[,] how long have I got left in the hole? I could keep going." Plaintiff has an expert report that states there was a failure to supervise and train. However, this report is similarly only based on Defendant Rowe's statements and his response to James Neske.

Defendant LVMPD argues that this claim must be dismissed because there is no underlying constitutional violation. LVMPD also argues that Plaintiff has made no attempt to prove her Monell claim because she fails to identify a written policy, provide evidence of an unwritten custom, or identify a single other instance that supports her claim.

The Court finds that Plaintiff's Monell claim fails as a matter of law on two grounds.

First, as discussed above, Plaintiff has failed satisfy her burden to show any violation of a constitutional right because of LVMPD's conduct. See City of L.A. v. Heller, 475 U.S. 796, 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite besides the point.") (emphasis original); Palmerin v. City of Riverside, 794 F.2d 1409 (9th Cir. 1986) (holding that there can be no local government liability for a constitutional deprivation where there has bene no constitutional violation). In the Ninth Circuit, municipal defendants may be liable under Monell where no individual officer is held liable for violating

constitutional rights, if "collective inaction" produced a stand-alone constitutional violation. Horton v. City of Santa Marta, 915 F.3d 592, 604 (9th Cir. 2019). Here, since Plaintiff has limited her argument to Defendant Rowe's conduct, the record does not support a finding that some systemic inaction produced James Neske's death.

Second, Plaintiff has not established a policy or practice outside of James Neske's own interaction with LVMPD. "While deliberate indifference can be inferred from a single incident when the unconstitutional consequences of failing to train are patently obvious, an inadequate training policy itself cannot be inferred from a single incident." Hyde v. City of Willcox, 23 F.4th 863, 874-75 (9th Cir. 2022) (citation omitted). Defendant Rowe's statements that he sometimes does not immediately respond to the emergency lights is insufficient to carry Plaintiff's burden. Plaintiff fails to show how a pattern of violations can be imputed to LVMPD's policy and practice.

Thus, the Court grants summary judgment in Defendant LVMPD's favor for Count III.

### C. Plaintiff's State Claims

The Court now turns to Plaintiff's Nevada state law claims against Defendants. Plaintiff's complaint asserts claims for: Negligence or Reckless disregard (Claim IV), Survivors Action (Claim V), Wrongful Death (Claim VI), and, against LVMPD only, Negligent Supervision (Claim VI). Defendants argue that these claims fail as a matter of law.

Nevada Revised Statutes § 41.032(2) addresses discretionary-act immunity. In the relevant part, § 41.032 provides, "no action may be brought . . . against . . . an officer or employee of the State or any of its agencies or political subdivisions which is . . . (2) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee[,] whether or not the discretion involved is abused." The Nevada Supreme Court has held that "[p]ersonal deliberation, decision and judgment are requirements of a discretionary act. . . . Such a decision should not be second guessed by a court with the benefit of hindsight." Parker v. Mineral Cty., 729 P.2d 491, 493 (Nev. 1986) (citations omitted). To determine whether an action of a state officer falls within the scope of § 41.032(2), a court must consider whether the action "(1) involve[s] an

element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." <u>Martinez v. Maruszczak</u>, 168 P.3d 720, 729 (Nev. 2007) (adopting the federal discretionary standard enunciated in <u>Berkovitz v. United States</u>, 486 U.S. 531, 536-37 (1988)).

Defendants both claim discretionary-act immunity from Plaintiff's state law claims. Defendant Rowe argues Plaintiff has failed to identify a statute or policy that mandated a time or manner for Defendant Rowe to respond to James Neske's emergency because such a policy does not exist. Instead, he suggests that the decision was based on policy decisions regarding the safety of the entire module and management the area. Regarding the Supervisory Liability claim, Defendant LVMPD adds that supervising and training are discretionary functions.

Plaintiff argues that whether Defendant Rowe was exercising due care in responding to the emergency light is a disputed material fact and sufficient to deny discretionary immunity. Plaintiff argues that exceptions to LVMPD's discretionary-act immunity for supervision for bad faith acts and negligence in the operational phase of a decision.

The Court finds that Defendant Rowe's conduct at issue was a discretionary act. Multiple exhibits explain that correction officers balance their other obligations—including the safety of the people in their custody—with responding to emergency lights. Put differently, Defendant Rowe made an "individual judgement" on when to respond to the Cell 14 emergency light that was based on "policy . . . considerations." <u>Martinez</u>, 168 P.3d at 729. Further, Nevada looks to federal decisional law on the Federal Tort Claims Act ("FTCA") for guidance on what type of conduct discretionary immunity protects. <u>Id.</u> at 727-28. Relevant FTCA caselaw indicates that Defendant Rowe was presented with a policy choice. <u>See, e.g.</u>, <u>Calderon v. United States</u>, 123 F.3d 947, 564-65 (7th Cir. 1997) (holding "it is clear that balancing the need to provide inmate security with the rights of inmates to circulate and socialize within the prison involves considerations based upon public policy."); <u>Alfrey v. United States</u>, 276 F.3d 557, 565 (9th Cir. 2002) (adopting the <u>Calderon</u> reasoning).

The Court finds that Defendant LVMPD's conduct falls under Nevada discretionary-act immunity. Relying on numerous federal analogues, the Nevada Supreme Court has held that LVMPD is entitled to discretionary-act immunity for negligent hiring. <u>See</u> <u>Paulos v. FCH1, LLC</u>,

- 2 -

456 P.3d 589, 595-96 (Nev. 2020) (outlining the caselaw behind Nevada's bar to negligent hiring, training, and supervision claims and affirming a Nevada district court decision to grant discretionary-act immunity to NVMPD). Further, in <u>Paulos</u>, the Nevada Supreme Court specifically declined to follow Plaintiff's cited caselaw for negligent supervision. <u>Id.</u> at 596 n.3. Further, this comports with FTCA caselaw. <u>See, e.g.</u>, <u>Vickers v. United States</u>, 228 F.3d 944, 950 (9th Cir. 2000) (citing cases and explaining that the Ninth Circuit and other U.S. Courts of Appeal have held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield."); <u>Gager v. United States</u>, 149 F.3d 918 (9th Cir. 1998) (holding that the government's decision to forego employee training was a discretionary one).

Therefore, the Court grants summary judgement for both Defendant Rowe and Defendant LVMPD on Plaintiff's state law claims against each.

**V.     CONCLUSION**

IT IS THERFORE ORDERED that Defendant Rowe's Motion for Summary Judgement (ECF No. 35) and Defendant Las Vegas Metropolitan Police Department's Motion for Summary Judgement (ECF No. 36) are GRANTED.

**DATED:** <u>September 30, 2023</u>

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**